**UNITED STATES of America,
Plaintiff,**

v.

**NORTHWEST INDUSTRIES, INC. and
the B. F. Goodrich Company,
Defendants.**

**No. 69 C 1102.**

United States District Court
N. D. Illinois, E. D.

July 11, 1969.

Order July 17, 1969.

Raymond P. Hernacki, Robert L. Eisen, John Cusack, Gary Senner, Law-

rence C. Roskin, Richard J. Rappaport, Allyn A. Brooks, James M. Landis, Michael L. Levinson, Dept. of Justice, Chicago, Ill., for the Government.

Albert E. Jenner, Jr., Samuel W. Block, Philip Tone, Wesley G. Hall, Keith F. Bode, Jerome J. Roberts, Jenner & Block, Chicago, Ill., Herbert A. Bergson, Samuel H. Seymour, Bergson, Borkland, Margolis & Adler, Washington, D. C., for Northwest Industries, Inc.

James E. Hastings, John T. Chadwell, Richard S. Rhodes, David A. Nelson, Champ W. Davis, Jr., Peter R. Sonderby, Chadwell, Keck, Kayser & Ruggles, Chicago, Ill., for B. F. Goodrich Co.

## OPINION

WILL, District Judge.

On May 21, 1969, the United States Government (hereinafter "the Government") filed the complaint in this cause alleging that the consummation of an exchange offer[1] made by Northwest Industries, Inc. (hereinafter "Northwest") to the stockholders of The B. F. Goodrich Company (hereinafter "Goodrich") on or about April 18, 1969, would violate Section 7 of the Clayton Act, as amended (15 U.S.C. § 18). The Government is seeking injunctive relief to prevent consummation of the exchange offer. On the same day that the complaint was filed, the Government moved for a temporary restraining order and a preliminary injunction. On May 22, 1969, this court entered an order temporarily restraining defendants from making the exchange offer effective pending determination of the Government's motion for a preliminary injunction.

The hearing on the Government's motion began on May 22, 1969, and continued for eighteen court days and two days of depositions through June 14, 1969. Determination of the questions presented by the Government's motion has consequently required extensions of the temporary restraining order to July 11, 1969.

The evidence before the Court, as required by the terms of the Clayton Act, has been directed to the nature, magnitude and ultimately the probable effect on competition of the proposed combination. Our findings with respect to this evidence may be stated initially as follows.

Defendant, Northwest, is a corporation organized and existing under the laws of the State of Delaware and maintains its principal office in Chicago, Illinois.[2] Northwest, chartered in August 1967, became a holding company in April 1968 and now owns a controlling interest directly or indirectly in the following operating corporations: Chicago & Northwestern Railway ("North Western"), Velsicol Chemical Corporation ("Velsicol"), and Michigan Chemical Corporation ("Michigan"). Through its

1. In December 1968 and January 1969 Northwest purchased approximately 700,-000 shares (approximately 5%) of the common stock of Goodrich. Then, on or about April 18, 1969, Northwest transmitted to the other stockholders of Goodrich a written exchange offer whereby Northwest, subject to the approval of its stockholders and upon the terms set forth in the exchange offer, offered to purchase any and all common shares of Goodrich and to pay for each share a total of:
   (a) $20 principal amount of 7½% subordinated debentures due 1994 of Northwest;
   (b) ⅖ths of one share of Series C $5 cumulative convertible preferred stock without par value of Northwest, each share immediately convertible into one share of common stock of Northwest as then constituted (which is now three shares of Northwest common stock after a split which became effective subsequent to the exchange offer); and
   (c) 3/10ths of a warrant expiring 1979 to purchase at a price of $110 per share one share of Northwest common stock which is now, after the split, 9/10ths of a Warrant to purchase, at a price of $36.67 per share, one share of Northwest common stock.

2. As used herein, "Northwest" means Northwest Industries, Inc., and all corporations which it controls, directly or indirectly.

acquisition in 1968 of a controlling interest in the Philadelphia and Reading Corporation, a holding company, Northwest also owns a controlling interest in the following operating corporations: Union Underwear Company, Inc. ("Union"), Imperial Reading Corporation ("Imperial"), Fruit of the Loom, Inc. ("FOL"), Acme Boot Company, Inc. ("Acme"), Universal Manufacturing Corporation ("Universal"), and the Lone Star Steel Company ("Lone Star").

Northwest is one of this nation's 130 largest industrial corporations in sales and among the 55 largest in assets. In 1968, Northwest had revenues of about $701 million, net income of about $52.5 million, and total assets of about $1.3 billion. As related to its diverse operating subsidiaries, Northwest's 1968 revenues were about 39 per cent from its railroad operations, 26 per cent from its industrial products group, 25 per cent from its consumer products group and 10 per cent from its chemical products group.

Northwest's railroad operations are conducted by its wholly owned subsidiary, the Chicago and North Western Railway Company ("North Western"). The railroad operations of Northwest are the fourth largest in the nation in trackage and thirteenth largest in gross operating revenues as measured by 1968 North Western revenues of about $276 million. The North Western operates approximately 11,600 miles of track in the eleven states of Illinois, Wisconsin, Michigan, Iowa, Minnesota, Nebraska, Missouri, Kansas, South Dakota, North Dakota and Wyoming. In extending its railroad operations, it has made the following acquisitions: 1. Litchfield & Madison Railway Co. (1958), 2. Minneapolis & St. Louis Railway Co. (1960), 3. Des Moines & Central Iowa Railway Co. (1968), 4. Chicago Great Western Railway Co. (1968). Also in 1968, the North Western and the Missouri Pacific Railroad each acquired 50 per cent of the stock of the Alton & Southern Railroad, a switching line in the St. Louis Gateway formerly controlled by the Aluminum Company of America.

Significant prospective increase in the magnitude of Northwest's railroad operations has also been presented by the evidence. In January, 1969, North Western completed an exchange offer for the stock of the Chicago, Milwaukee, St. Paul and Pacific Railroad Company ("Milwaukee Road"). An interstate Commerce Commission examiner recently gave conditional approval to the merger, which is now pending before the full commission. The Milwaukee Road operates about 10,500 miles of railroad in all of the States served by the North Western except Wyoming, and operates additionally in Montana, Washington, Idaho and Indiana. In 1968, the Milwaukee Road's railroad operations generated about $274 million in revenues. The merger of the North Western and the Milwaukee Road would have the sixth highest gross operating revenue of railroads in the United States and the combination would be the first in miles of track operated of railroads in this country.

The prospective extension of Northwest's railroad operations also involves an exchange offer North Western made in 1968 to stockholders of the Rock Island Railroad ("Rock Island") and the acceptance of the offer by the holders of 54.3 per cent of Rock Island's common stock as of September 30, 1968. North Western is presently a party to a consolidated ICC proceeding in which other railroads are also seeking control of the Rock Island. Rock Island operates over 7,000 miles of track in the States of Illinois, Iowa, Missouri, Kansas, Oklahoma, Texas, Arkansas, Louisiana, Minnesota, Nebraska, Colorado, New Mexico, South Dakota and Tennessee. In 1968, the Rock Island Railroad had a total operating revenue of about $239 million.

Northwest's industrial products group accounted for sales of approximately $178.5 million in 1968. These operations are conducted through the subsidiary Philadelphia & Reading Corporation

and its ownership of Universal Manufacturing Corporation and Lone Star Steel Company. Universal, headquartered in Patterson, New Jersey, operates plants in New Jersey, Connecticut, and Mississippi, and produces fluorescent ballasts and insulated wire. Lone Star, headquartered near Longview, Texas, is a fully integrated steel producer selling from its Texas steel mill primarily in eleven southern and southwestern states. Steel tubular goods for use by the construction, plumbing, ordnance and oil and gas industries comprise the principal product line of Lone Star. Other products include cast iron pressure pipe, concrete reinforcing bars, semi-finished goods such as ingots, slabs, and skelp for use by constructors and fabricators, and some coke by-product and chemical derivatives.

Northwest's consumer products group accounted for sales of approximately $174.9 million in 1968. These operations are conducted by the following subsidiaries of Philadelphia & Reading: Union Underwear Company, Inc., Imperial Reading Corporation, Fruit of the Loom, Inc., and the Acme Boot Company, Inc. Union, which operates plants in four states, manufactures and sells men's and boys' underwear, and dress and sport shirts, primarily under the "Fruit of the Loom" label. Imperial, operating eight plants in four states, manufactures and sells men's dress and sport shirts, men's and boys' dungarees and leisure-type jeans, ladies' and girls' shirts, blouses, and sportswear, and children's play clothes. Fruit of the Loom, Inc. does no manufacturing but owns the "Fruit of the Loom" trademark which it licenses primarily to manufacturers of apparel and home furnishings. Acme and its subsidiary, Joseph F. Corcoran Shoe Co., Inc. ("Corcoran") operate six plants in Tennessee and Massachusetts. Acme is the country's largest producer of leather boots and also manufactures boots having poromeric uppers. Its subsidiary, Corcoran, produces men's dress shoes, golf shoes and paratroop boots, utilizing both leather and poromeric materials.

Northwest's chemical products group accounted for sales of approximately $71.8 million in 1968. These operations are conducted by the Velsicol Chemical Corporation and Michigan Chemical Corporation. Velsicol, headquartered in Chicago, operates four plants in Tennessee, Illinois and Texas, and produces and sells pesticides, benzoic acid and its derivatives, and petrochemical resins. Michigan, headquartered in Chicago, operates four plants in Michigan, Ohio, and Arkansas, and produces and sells chemicals derived from brine, such as magnesia, bromine, and brominated compounds, including flame-proofing and flame retardant chemicals used primarily in the manufacture of plastics and textiles, and miscellaneous chemical products.

Goodrich is a corporation organized and existing under the laws of the State of New York and maintains its principal office in Akron, Ohio. In 1967, Goodrich was the nation's 83rd largest industrial corporation in sales and the 86th largest in assets. In 1968, Goodrich had net revenues of about $1.1 billion, net income of about $44.8 million, and assets of about $1 billion.

Goodrich is highly diversified and is composed of the following domestic divisions and subsidiaries: B. F. Goodrich Aerospace & Defense Products; B. F. Goodrich Chemical Company; B. F. Goodrich Footwear Company; B. F. Goodrich Industrial Products Company; B. F. Goodrich Textile Products; B. F. Goodrich Tire Company, and Ameripol, Inc. (formerly Goodrich-Gulf Chemicals, Inc.). In 1968, Goodrich derived about 40 per cent of its operating revenues from its tire division, 20 per cent from its chemical division, 15 per cent from its industrial products division, 5 per cent from its footwear division, 5 per cent from its aerospace division, and 2 per cent from its textile division. The remainder of Goodrich's operating revenues were derived from foreign sales.

The present Goodrich business organization has also developed to some extent through acquisitions. In 1961, Goodrich acquired the Rayco Manufacturing Company, a Pawtucket, Rhode Island manufacturer of automobile seat covers and convertible tops which are sold through Rayco's own national chain of approximately 140 stores and franchised dealers. In 1969, Goodrich purchased Gulf Oil Corporation's one-half interest in Goodrich-Gulf Chemicals, Inc. ("Goodrich-Gulf"), to become the sole owner of a major producer of synthetic rubber with annual sales of approximately $90 million. Goodrich-Gulf has since been renamed Ameripol, Inc. In 1969, Goodrich also acquired a Terre Haute, Indiana, trucker, Motor Freight Corp., which operates 19 terminals and about 1,000 pieces of equipment in the States of Illinois, Indiana, Ohio, Kentucky, Tennessee, Iowa, Nebraska and Missouri.

Goodrich's tire division is headquartered in Akron and operates six plants in Ohio, Pennsylvania, California, Alabama, Oklahoma and Indiana. This division manufactures and sells vehicular tires and tubes and also manufactures automotive accessories and supplies.

Goodrich's chemical division is headquartered in Cleveland and operates plants in Ohio, Kentucky, Illinois, California and New York. This division produces and sells vinyl monomers and polymers, including polyvinyl chloride ("PVC") and other plastics, synthetic rubber, petrochemicals, and other basic chemicals.

Goodrich's industrial division is headquartered in Akron and operates plants in Ohio, New Jersey, Pennsylvania, Alabama, Massachusetts, California, Minnesota, Illinois, Indiana, Tennessee and Connecticut. Its industrial products line includes flat belts, V-belts, hose, sheet rubber, special industrial products, adhesive products, building products, golf ball centers, molded and coated products, footwear, plastic products, poromeric materials, shoe products, and sponge products. Its consumer products are rubber bands and household products, vinyl upholstery and wall covering, rubber latex hospital-surgical items, rubber latex surgeon's gloves, rubber sponge carpet cushion, rubber latex foam furniture cushioning, mattresses and pillows.

Goodrich's footwear division is headquartered in Watertown, Massachusetts, and operates plants in Massachusetts, North Carolina and Puerto Rico. This division manufactures and sells canvas, casual and golf shoes; and men's, women's and children's rubber, fabric and plastic boots.

Goodrich's aerospace division is headquartered in Akron and operates two plants in Ohio. This division manufactures and sells tires and tubes, wheels and brakes for aircraft, and other rubber and plastic aircraft components and products.

Goodrich's textile division is headquartered in Thomastown, Georgia, and operates plants in Georgia and Pennsylvania. It produces tire cord, industrial fabrics, and single and plied carded and combed yarns.

The evidence and testimony presented during the hearing on the Government's motion reflects the complex and comprehensive nature of the business activities of both Northwest and Goodrich that has been described above. As a result, the Government's allegations and its attempts to demonstrate the anti-competitive nature of the proposed combination include an extraordinarily wide variety of allegedly anti-competitive relationships, including traditional horizontal, vertical and potential competition, as well as some unique to the conglomerate phenomenon. Consequently, the evaluation of probabilities which determination of the Government's motion requires necessitates a similar variety in analysis.

Due of course in large part to the emergency and preliminary nature of the motion before the court, the evidence as to the probable effects of the merger has been deficient in many respects, par-

ticularly in the definition of the relevant markets involved and the degrees of concentration or trends to concentration in any particular line of commerce in any section of the country. However, substantial data is before the court, and the following preliminary description of various product and service lines which might be affected by the proposed combination may be stated.

## CAUSTIC SODA

Both Goodrich and Northwest (through Velsicol) are present producers of caustic soda, a corrosive chemical which is used throughout the chemical industry as an alkalizer to neutralize acid waste and to make neutral salts of various types of acids. It is also used in large volume by the petroleum, paper, rayon, cellophane and aluminum industries, and is beginning to be used by the glass industry as a replacement for soda ash. As the market or "universe" in which Goodrich and Northwest compete in the sale of caustic soda, the Government has described what it calls the "inland waterway area," an area consisting of portions of twelve states adjoining the Mississippi and Ohio Rivers and their tributaries, going as far north as Chicago and almost as far south as Baton Rouge, Louisiana. In describing this market the Government fundamentally relies on the fact that Goodrich sold over 95% of its 1968 production in this area and also relies on the fact that Northwest sold 85% of its 1968 production in this same area.[3]

Caustic soda is a by-product chemical which is generally sold in a solution which is 50% water to simplify handling. Because of its considerable weight, bulk and the special handling required, freight costs are considerable and, unless cheap water transportation is employed, the product is generally sold fairly close to the plant. Larger producers employ special barges and have terminal points along water routes from which they transport the product short distances over land. Both Goodrich and Northwest produce caustic soda which they sell in a 50% water solution. The Goodrich plant at Calvert City, Kentucky, and the Velsicol plant at Memphis, Tennessee, are located within 200 miles of each other and compete, particularly in Northern Alabama, Georgia, Tennessee and Arkansas. Moreover, this competition is expected to be increased when Goodrich constructs a caustic soda terminal it is planning to locate in the Kentucky lakes area.

In 1968, twenty different companies sold caustic soda in the inland waterway area, eight of which had production facilities in the area. The eight are: Pennsalt and Goodrich at Calvert City; Monsanto at East St. Louis, Illinois; Arkla at Pine Bluff, Arkansas; Velsicol at Memphis, and Stauffer, Olin, and Diamond Shamrock in the Northern Alabama, Mississippi, and Southern Tennessee area.

Caustic soda producers located in the so-called inland waterway area do not normally compete in the Gulf Coast area, where there is excess production. Indeed, between 40% and 52% of the total United States caustic soda production (over 8,000,000 tons in 1968) is concentrated in the Mississippi Delta-Gulf Coast area which includes Mississippi, Louisiana, Alabama and Texas. Gulf Coast producers, on the other hand, do ship up the inland waterway and beyond by barge and sell caustic soda in the inland waterway area competing with producers located in the area. Major caustic soda production facilities are located near Baton Rouge, Louisiana about 72 miles to the south of the southern boundary of the inland waterway area as described by the Government.

---

**3.** Specifically, in 1968 Goodrich sold about 104,000 short tons of caustic soda it produced at Calvert City, Kentucky; and Goodrich sold about 98,000 short tons of this production in the inland waterway area. In 1968 Velsicol produced about 28,000 short tons of caustic soda at Memphis, Tennessee, and sold 24,067 tons of this production in the inland waterway area.

Of the total 1968 sales in the Government's inland waterway area of 908,607 short tons of dry weight caustic soda, Goodrich had sales of 98,000 short tons or 10.79%,[4] and Velsicol had sales of 24,067 short tons amounting to 2.65%. Evidence as to concentration shows the top five sellers in the inland waterway had a combined share of 48.98% of total sales, with the first four firms having about 43–45% of total sales. In 1968, Goodrich was apparently the third largest seller in the area and Velsicol was the eleventh.

On the basis of the 1968 figures, the proposed combination of Goodrich and Northwest would be the second largest producer in the area, with 13.4% of sales. Of significance also is Goodrich's plan to construct a new terminal in northern Alabama, and the fact that Velsicol announced an increase in its caustic soda capacity in late 1968 and expects to produce about 48,000 short tons of 50% water solution caustic soda in 1969, almost a 100% increase over its 1968 production of 24,067 short tons. Moreover, while the rated capacity for caustic soda of the Goodrich plant at Calvert City is 120,000 short tons per year, equipment delivery and technical operating problems prevented the Calvert City plant from operating at full capacity in 1968. Goodrich expects to operate the plant at its full rated capacity in 1969, and has indicated that it will attempt to sell all of this production in the inland waterway area.

### MURIATIC ACID

With respect to muriatic acid, the Government alleges that the proposed combination of Northwest and Goodrich presents a potential impact on competition. Goodrich makes but does not presently sell by-product muriatic acid. Goodrich has, however, constructed a new plant to dispose of accumulated and accumulating chemical by-products from its Calvert City operation and expects to have this plant in operation by mid-1969. This plant is expected to produce annually approximately 50,000 tons of by-product muriatic acid, which Goodrich may either use in its Calvert City plant or market. Goodrich's studies to date have not demonstrated whether marketing of the muriatic acid production can be done profitably or in what geographic area. Northwest, through Velsicol, presently makes and sells by-product muriatic acid at its Memphis, Tennessee and Chattanooga, Tennessee plants though the record is not clear as to the area in which it sells.

On the basis of the area where Goodrich believes it may be able to sell its production, the Government suggests another "inland waterway" market area. In the area described, demand is presently about 600,000 tons per year. Northwest, however, insists to the contrary that the area in which Goodrich may reasonably be expected to sell its muriatic acid offers a market for at least 1,200,000 tons. Northwest arrives at this figure by adding to the "lower inland waterway area" which the government suggests, a "northern inland waterway area" where the Director of Planning for B. F. Goodrich Chemical testified that another 600,000 are sold and Goodrich is studying the feasibility of selling therein.

Muriatic acid is shipped in a solution which is two-thirds water. Because it is even heavier than caustic soda and more dangerous to handle, the freight penalty is severe and shipment is more restricted. Since the plants of Goodrich and Velsicol are within 200 miles of each other in the lower portion of the inland waterway, they could be expected to compete.

It is estimated that Velsicol will produce 62,663 short tons of muriatic acid in 1969. There is, however, no evidence as to its sales nor the areas in which such sales may be made.

4. In addition, Goodrich purchased for resale an additional 36,000 tons of caustic soda and this amount was sold outside of the Inland waterway area.

Whether Goodrich enters the muriatic acid market will depend upon the results of a market survey which Goodrich expects to complete later this year. But in 1966, Goodrich's study of the muriatic acid market led the company to the conclusion that oversupply and other factors made entry undesirable. The Director of Planning for B. F. Goodrich Chemical also testified that the muriatic acid market was one of oversupply in 1967. There is, in addition, some question whether the by-product muriatic acid from Goodrich's new plant will be of saleable quality. Goodrich's sale of muriatic acid will thus depend on its market survey, the economies of the operation of its plant, and the quality of the by-product muriatic acid it produces in its new plant. It nevertheless remains the case that there is incentive for Goodrich to market its muriatic acid, if economically feasible, since Goodrich recognizes as its alternatives either the sale of the muriatic acid or recycling it into its production process, and this recycling into Goodrich's vinyl chloride monomer process as hydrochloric acid would create a production imbalance which would require further adjustment.

Recognizing that the muriatic acid market described has in the past been characterized by conditions of oversupply, that there is no assurance Goodrich's by-product muriatic acid will be of saleable quality, etc., if we assume that Goodrich could sell all the muriatic acid produced at its Calvert City plant and that Northwest could sell all the muriatic acid it produces, the two companies could account for 110,000 tons sold, or about 18% of the Government's suggested universe of 600,000 tons.

## OTHER CHEMICALS

Besides muriatic acid, the Government contends that common control of Northwest and Goodrich would eliminate Goodrich as a likely independent entrant into the production and sale of various other chemicals which Northwest now produces or might subsequently produce. These are asserted to include benzoflex varieties of plasticizers and petroleum resins. Velsicol presently produces products of both these types. As to this alleged potential competition, evidence is presently particularly deficient in the critical areas of both production capability and market structure.

## HCPD

The Government also maintains that there is potential horizontal competition between Goodrich and Northwest in the sale of Hexachlorocyclopentadiene ("HCPD"). HCPD is produced by chlorinating cyclopentadiene, and it is used in the manufacture of pesticides as well as various polyesters to which latter it imparts the quality of flame resistance.

At the present time, Velsicol is one of the two major producers of HCPD in the United States (the other being Hooker Chemical). Velsicol produced 26,686,000 pounds of HCPD in 1968; 17,365,000 pounds of this production were consumed internally by Velsicol; and 8,640,730 pounds were sold to outside concerns for $1,589,548.

Goodrich has cyclopentadiene available at Calvert City from its dripolene production, and Goodrich expects to have excess chlorine available at Calvert City very soon. Goodrich has indicated that it is in a position to produce HCPD economically since it has facilities to utilize the hydrochloric acid which is now produced as a by-product of the HCPD manufacturing process. Goodrich is now in the process of conducting market research and economic evaluation of the feasibility of making and selling HCPD. The Director of Planning for B. F. Goodrich Chemical Company has testified that the production and sale of HCPD is an attractive field for possible entry since there are only two major producers in the United States and demand for this product is growing. Also, he has testified that Goodrich has in storage about six million pounds of cyclopentadiene, the hydrocarbon starting material for the manufacture through a chlorination process of HCPD. It is not

clear from the record thus far, however, whether Goodrich has the technical know-how and, perhaps more importantly, access to patents necessary to develop an HCPD process. Nor is there any evidence as to the market potential both as to quantity and area of distribution, profit potential, etc.

## PVC

Another contention of the Government is that the acquisition of Goodrich by Northwest would harm competition in the sale of polyvinyl chloride (PVC). The contention here is that competition would be harmed horizontally with respect to future competition between Goodrich and Northwest (through Lone Star) in the manufacture and sale of plastic pipe, and vertically in that Northwest (through Universal, Acme and Lone Star) is a substantial user of and, therefore, customer for PVC.

PVC is a resin manufactured from the polymerization of vinyl chloride monomers. There are over 100 varieties of PVC resins manufactured in the United States. PVC is weather resistant and flame, oil and chemical resistant. It can be compounded with plasticizers to make flexible products (such as shower curtains, plastic tape and film for packaging)—with fillers and plasticizers to make semi-rigid products (such as wire cable insulation and weather stripping) —and with certain additives to make rigid products (such as pipe, window paneling, and house siding). PVC also competes with steel in the sheeting area for nonload-bearing kinds of end uses.

Goodrich is one of two companies which pioneered in the development of PVC uses and markets in the United States and is presently the leading producer of PVC in the country. In 1968, it produced and marketed about 20% of the approximately 2.3 billion pounds produced and the 2.2 billion pounds sold in the United States.

In 1968, of the 2.2 billion pounds of PVC sold in the United States, about 340 million pounds or 15% were PVC for rigid end use applications. Goodrich pioneered the use of rigid PVC in the United States and is the leading producer of PVC for rigid end use applications with 40% of the total sales in 1968.

Rigid PVC is sold in a concentrated but expanding market in which the top four producers of PVC for rigid end use applications accounted for over two-thirds of the total sales in 1968. The Government focuses somewhat unclearly on this rigid PVC market and on the market for the most important rigid end use application, PVC pipe, in contending that the combination of Northwest and Goodrich will lessen horizontal competition in this area.

In 1968, about 65% of all rigid PVC applications were for pipe. B. F. Goodrich is the dominant producer of PVC for pipe applications, accounting for over 40% of the total United States sales in 1968. Goodrich's Industrial Products Division is engaged modestly in the manufacture and sale of plastic pipe from its plant in Marietta, Ohio. Its sales of plastic pipe in 1968 were about $500,000. Goodrich has indicated no present plans to expand its production and sale of plastic pipe.

Goodrich's activities, however, extend beyond that of an ordinary raw material supplier in that it has a program of showing potential customers how to make plastic pipe and fittings and providing customers with know-how. There has been evidence that Goodrich promotes the use of plastic pipe and assists customers in complying with production codes.

Northwest's Lone Star is a fully integrated steel producer located at Dallas, Texas. Lone Star produces cast iron and steel pipe which competes with PVC pipe for at least some end use applications and is potentially competitive as to a number of others. About 80–85% of Lone Star's sales are steel pipe, of which over one-half goes to the oil and gas industry. Lone Star markets its pipe in the southern and southwestern United

States, principally in Texas, Louisiana, Oklahoma, Arkansas, Kansas, Colorado, New Mexico, Arizona and Wyoming. None of Goodrich's sales of its PVC pipe which is manufactured in Ohio were in this area.

Competition between plastic pipe and metal pipe, including cast iron and steel, is growing; and PVC is one of the most important plastics used to make pipe. Goodrich estimates that total annual sales of plastic pipe in the United States in 1968 were about $175,000,000 of which about $85,000,000 represented sales of PVC pipe. Plastic pipe, particularly PVC, is increasingly competitive for water supply, and drain, waste and vent end uses. PVC pipe is also competing with metal pipe for low pressure gas distribution and oil collection end uses, among others.

Steel pipe producers are generally potential entrants into the plastic pipe business which is, in many respects, complementary as well as competitive. There has been evidence that Lone Star in particular has been considering the possibility of either manufacturing or purchasing plastic pipe for sale and can be considered a likely entrant. Lone Star would use its existing metal pipe distribution system to market its plastic pipe.

Because of freight costs, plastic pipe apparently cannot be economically marketed more than approximately 400 miles from its production site. Northwest maintains that because the area in which Lone Star markets its pipe cannot be economically served from Goodrich's plant in Marietta, Ohio, the acquisition would not lessen the likelihood of Lone Star's entry into the plastic pipe business; and that if Lone Star entered the plastic pipe business, it would not be in competition with Goodrich in selling plastic pipe.

The total PVC market, like that for rigid end use applications alone, is highly concentrated. In the total PVC market the top four producers account for approximately 50% of the total sales.

With respect to this total market for PVC and with respect to the manufacture of PVC pipe, the Government alleges that the combination of Northwest and Goodrich would result in vertical lessening of competition.

The vertical effects alleged relate to PVC as a raw material for a number of the products which Northwest manufactures through its various subsidiaries. The following divisions are actual or potential customers of Goodrich for PVC resins or compounds. In 1968, Universal Manufacturing purchased 2,250,000 pounds of PVC at a cost of $388,000 for use as wire insulation. In 1969 it expects to purchase 2,750,000 pounds of PVC at a cost of $480,000.00. In 1968, Acme Boot purchased 266,125 pounds of PVC at a cost of $53,718.00. PVC is used in Acme's new patented U-Nexus boot construction process. In 1969 Acme expects to purchase 418,435 pounds of PVC at a cost of $84,000.00.

Goodrich is a potential supplier of PVC resins and compounds to Northwest's Lone Star subsidiary if the latter does become a fabricator of plastic pipe. The principal interest of Goodrich in the pipe industry is as a supplier of compounds and resins to companies that fabricate plastic pipe. In 1968, the four largest producers of plastic pipe each consumed about 500,000 pounds of PVC per month, or 6 million pounds per year.

There have been discussions between officials of Lone Star and Goodrich with respect to Lone Star establishing a plastic pipe fabrication facility. These discussions occurred on January 21-22, 1969, and, at the conclusion of these discussions, an officer of Lone Star stated that the company was seriously interested in going into the plastic pipe business. It may also be noted that, as well as being a potential supplier of PVC to Lone Star, Goodrich would have considerable know-how to impart to Lone Star which it would presumably provide whether or not the companies were affiliated since Goodrich is aggressively seeking new PVC customers.

## CO-PRODUCT RESIN STREAM

The Government has also alleged that Goodrich, through its subsidiary Ameripol, is a potential supplier of resin-forming components to defendant Northwest's Velsicol subsidiary. Beginning with conversations which occurred on July 17, 1968, representatives of Ameripol and Velsicol have discussed the sale of by-products from Ameripol's Port Neches, Texas plant containing such components. The discussions concerned the sale of 2.4 million gallons of this by-product at 35¢ per gallon, or $840,-000 annually. These discussions continued intermittently after July 17, 1968 and a sample was provided to Velsicol in February, 1969 pursuant to its prior request. No further contact with Velsicol was made by the Ameripol representative after April 16, 1969 in light of the Northwest offer to purchase Goodrich stock.

## FOOTWEAR

Northwest, through its subsidiary Acme Boot Company, Inc. (Acme) and its subsidiary, Joseph F. Corcoran Shoe Co., Inc. of Stoughton, Massachusetts, manufactures and sells approximately $40 million worth of footwear annually, the bulk of which consists of boot sales. Acme has been dominant in the cowboy boot market and has an overwhelming share among major United States manufacturers in certain boot submarkets. Acme apparently accounts for 85% of all major producer's national sales of cowboy boots, 90% to 95% of paratroop boots and 24% of Wellington boots.

The B. F. Goodrich Footwear Company markets a broad line of footwear throughout the United States. In 1968, the sales volume of Goodrich Footwear was $52 million. This consisted primarily of sales of boots (over-the-sock) in the amount of $6 million, canvas and casual footwear in the amount of $38 million (ranking number two in United States sales), and rubber rainwear (over-the-shoe) and industrial footwear in the amount of $8 million. In 1968,

Acme's boot sales were $34,171,000 comprised of 4,334,378 pairs of boots of all the types it manufactures. The 1968 figure of $6 million in boot sales for Goodrich was comprised of 1 million pairs of all the types of boots that Goodrich manufactures. Further breaking down the Goodrich sales: $4.5 million, or 75% (850,000 pairs) were women's, misses' and children's vinyl fashion boots; approximately $600,000 (30,000 pairs) were miscellaneous apres-ski boots; and the remaining $900,000 consisted of $300,000 (65,000) pairs of men's waterproof molded vinyl Wellington boots and $600,000 (50,000) pairs of men's heavy duty rubber waterproof boots.

Some of Goodrich's boot products appear to be directly competitive with Acme's, such as synthetic versus leather Wellingtons and laced leather boots. Women's and children's high style synthetic boots are not competitive with Acme's present line, but Acme is a possible entrant therein, having already considered making such products.

Another area of potential competition involved is canvas and casual shoes. Goodrich is the country's second largest seller of canvas and casual shoes with 1968 sales of $38 million. The Government describes this as a highly concentrated field where the top three sellers account for 60% of total sales. Acme may be a potential entrant into this market, having already started producing synthetic casual footwear.

Northwest is the country's fifth largest maker of golf shoes, with 1968 sales of $1,800,000 (approximately 157,000 pairs) or about 6% of the national sales of all manufacturers. The Government describes a universe exclusive of imports, in excess of $29 million. The top five producers account for about 60% of this market. Goodrich, while not a manufacturer, sells golf shoes produced by others similar to Northwest's but of a synthetic material. Its 1968 sales were $155,000 which amounted to 10,000 pairs. It has recently undertaken a vig-

orous promotional campaign and anticipates a substantial increase in golf shoe sales in 1969 to 20,000 pairs, and its sales projection for three years hence is 100,000 pairs. Northwest contends that the golf shoes sold by Goodrich are not reasonably interchangeable or competitive with the leather golf shoes sold by Northwest as to quality and use, because Goodrich's golf shoes are made of a polymeric vinyl material which does not permit the foot to breathe, Goodrich's golf shoes being designed particularly for use under wet playing conditions.

The footwear products of Acme and Goodrich are distributed largely through similar channels and sales organizations. Acme products are found in many of the same 20 to 25 thousand retail stores selling Goodrich footwear and are advertised in the same publications. The combination of Northwest and Goodrich could distribute and advertise jointly a broad line of footwear, which would afford lower marketing and distribution costs than each now bears, and would tend to create a stronger relationship with the customers of each, to the disadvantage of their competitors unable to market a comparable broad line.

Canvas and casual footwear have also frequently been promoted in conjunction with wearing apparel. The Government contends that if Goodrich Footwear is acquired by Northwest, many items in the Goodrich line of canvas and casual footwear could be advertised, promoted and sold in combination with apparel products sold by Northwest (through Union and Imperial), affording the same sort of competitive advantages described above with respect to the combination of footwear alone.

## SHOE COMPONENTS

Goodrich is the country's third largest producer and seller of shoe components (heels, soles, and sole sheets), with 1968 sales totalling $12 million or 13.8% of the total industry sales reported by the Rubber Manufacturers Association. The top four producers account for about 60% of the total sales of $88–89 million. Acme is one of the country's largest users of shoe components. Goodyear is the largest supplier of shoe components to Acme, and its Neolite brand name is featured in Acme's catalog; conversely, Acme is one of the ten largest customers of Goodyear for shoe components; in 1968 Goodyear sold Acme over $1 million of shoe components. In 1968, Acme purchased about $430,000 of shoe components from Goodrich. The Government contends that if Northwest gained control of Goodrich, the latter would not only retain the present business from Acme but could reasonably be expected to obtain up to an additional $1 million of Acme's requirements, now going to Goodyear and to smaller suppliers.

In addition, Acme buys $600,000 annually of a poromeric leather substitute made by duPont called "Corfam." Goodrich recently started making a similar product called "Aztran" which it now claims to be superior. The Government contends that if Northwest and Goodrich are combined, Goodrich could obtain all of Acme's requirement of artificial leather.

Finally, another vertical aspect of the combination of Goodrich's and Northwest's footwear activity arises from Goodrich's production of PVC. Acme is the owner of a patented process called "U-Nexus" by which PVC is injected between the footwear sole and the upper to form a waterproof bond between the two. The Government contends that if Goodrich were acquired by Northwest, Acme could be expected to purchase its PVC requirements solely from Goodrich.

## PRODUCTS MADE BY GOODRICH AND USED BY THE RAILROAD INDUSTRY

Goodrich manufactures and sells a line of products used by railroads and railroad car manufacturers such as: flat belts, V-belts, molded and coated products, industrial protective clothing, shoes and gloves, and rainwear. In 1968,

Goodrich sold about $2.5 million of such products to the railroad industry. The total railroad industry market for these types of products was approximately $46 million for 1968. The Government points out that if Northwest gained control of Goodrich, it could increase its purchases of the above types of products from Goodrich, could specify the Goodrich components to its railroad car suppliers and could induce other railroads to do the same. Northwest, on the other hand, claims that when ordering new cars, it has a strict policy of permitting the car manufacturer to select components for the cars, and does not, under any circumstances, designate any components made by particular manufacturers.

### YARN

Among the various fabrics manufactured by the Goodrich Textile Division of the B. F. Goodrich Company is "sales cotton yarn" (yarn sold on the market instead of being used for internal consumption) in the range of 20/1 to 30/1, combed and carded, warped and knit, and single or plied. Goodrich yarn is known in the trade as high quality yarn. In 1968, Goodrich produced approximately 26 million pounds of 20/1 to 30/1 count cotton yarn and its total dollar sales were $15 to $17 million.

Cotton knit underwear is made out of cotton knitting yarn in the range of counts from 20/1 to 30/1. In 1968, Northwest (through its subsidiary Union Underwear) manufactured 23,-878,000 pounds of 20/1 to 32/1 count cotton knitting yarn. This yarn was used in Union's production of knit men's, boys' and infants' underwear. Union does not sell any "sales" yarn.

Goodrich Textile Division is the major supplier of "sales" yarn to Union. In 1968, Union purchased 1,360,000 pounds of 20/1 to 30/1 count cotton knitting yarn at a cost of $852,000, and of this total Goodrich supplied 1,251,000 pounds at a cost of $772,000. In 1968, Union was Goodrich Textile Division's fifth largest yarn customer and its fourth largest knitting yarn customer.

The General Manager of Goodrich's Textile Division testified that if Northwest obtains stock control of Goodrich, Union would have available to it approximately 10–15 million pounds of cotton yarn and would be able to obtain from Goodrich Textile Division its total "sales" yarn requirements. He testified that an underwear manufacturer can secure yarn for its own knitting and fabricating operations more economically from captive production than it can purchase that yarn on the market, and that the difference in cost between captive yarn and yarn produced on the open market can be as high as 5 to 10 cents a pound. He thus concluded that if Northwest had stock control of Goodrich, Union would have an advantage over other competitors who bought from Goodrich Textile Division inasmuch as Union would have available a cheaper captive source of supply.

Northwest urges that, rather than focus on 1/20 to 1/30 cotton yarn, the court consider cotton yarn generally as the relevant line of commerce. It relies on evidence showing that there are over 19,000,000 spindles in the United States devoted to the production of cotton yarns; that a spindle can, with relatively minor adjustments requiring a shutdown of about two hours, be converted to produce yarn of a different count; and that cotton knitting yarn producers make such changeovers frequently, usually within size ranges they are set up to run, such as 10's to 30's count yarn. The General Manager of Goodrich's Textile Division testified that he and his sales department estimated that about 100 million lbs. of 20's to 30's cotton knitting yarn was produced in the United States, and that Goodrich has 20% to 25% of that production, but that to his knowledge no published figures for United States production are available and that certain yarn mills producing and selling cotton knitting yarn in the 20's to 30's range were not considered. In view of this testimony and the lack of other evidence, not only is the Court unable to determine from the evi-

dence before it whether the 20's to 30's count range of cotton knitting yarns constitutes a relevant line of commerce, but the Court is also unable to determine what percentage of the total cotton knitting yarns in the 20's to 30's count range produced and sold in the United States are produced and sold by Goodrich and the Court is unable to determine what percentage of all such cotton knitting yarns is represented by the sales of Goodrich to Northwest.

## FREIGHT TRANSPORTATION AND TRANSPORTATION RECIPROCITY

The B. F. Goodrich Company and its various divisions spent approximately $55 million in 1968 for rail and truck transportation services within the continental United States. This consisted of 60% rail traffic and 40% truck traffic and included both inbound and outbound freight. In 1968, Ameripol, a Goodrich subsidiary, paid an additional $5,509,000 for outbound freight, including $2,-859,000 for domestic rail shipments, $1,425,000 for domestic truck shipments, and $1,225,000 for marine shipments outside of the United States.

In 1968, Goodrich shipments over the North Western, Milwaukee and Great Western ("Northwest Lines" referring to the combination of these three railroads) totalled approximately $747,000. Ameripol shipments over these same railroads amounted to $3,630 exclusive of all intracompany shipments to Goodrich. Goodrich exercises its right to route the traffic in over 90% of all of its shipments and pays the freight on all shipments. If Northwest Industries were to gain stock control of the B. F. Goodrich Company, it would also be in position to control Goodrich and Ameripol shipping.

Approximately 20% of Goodrich's $55 million in transportation expenditures, or about $11 million, passes through areas of the country served by Northwest Lines. The Government contends that if Northwest Industries controls B.

F. Goodrich Company, shipments amounting to approximately $2.4 million could be diverted from trucking companies which presently carry Goodrich shipments, to Northwest Lines and other railroad lines. The Government also contends that Goodrich shipments of $2.-2 million which are now passing over railroads other than Northwest Lines, could be rerouted so that they pass, at least in part, over Northwest Lines, with the actual amount in revenue to Northwest depending upon a division of the revenue between Northwest Lines and other interlining carriers which would haul the freight in this area based upon the proportionate mileage of each carrier.

The Government also contends that Ameripol rail shipments in the amount of $152,000 per year could be diverted by Northwest Industries to a route which would include the Northwest Lines. The Government maintains that about 70% of this amount, $106,000, would inure directly as revenue to the Northwest Lines for their portion of the hauls. In addition, Ameripol truckload shipments of approximately $43,000 could allegedly also have been diverted from truck to rail transportation, and Northwest Lines could have gained approximately $27,000 revenue by this diversion in 1968.

There has been testimony that such diversion is valuable. P. T. Johnson, Vice President of Sales of Roadway Express, Inc., testified that Roadway carried $2.2 million of shipments for Goodrich in 1968 and that, in his opinion, if Northwest gained control of Goodrich a substantial portion of this volume could be diverted to Northwest Lines and to other railroads. Lloyd C. Brandt, Vice President of Sales of Yellow Freight Systems, testified that Yellow received $672,000 in freight revenues from Goodrich in 1968, and that $319,000 of this was full truckload business, of which Brandt testified that nearly 100% could have been diverted to railroad transportation and in which Northwest Lines would have shared in the division of

revenues. Lawrence Manley, General Manager of Manley Transfer Company of Kansas City, testified that Manley carried approximately $78,000 in shipping for Goodrich in 1968. He testified that all of this shipping was interlined to other carriers in order to reach its destination and therefore the actual amount of shipping involved was approximately $300,000. He also stated that about 40% of Manley's portion of this freight (30,000) would have been in truckload volume shipments, that 100% of the truckload volume shipments could have been diverted to railroad carriers, and that about 40% of any such diverted freight revenues would inure to the benefit of the Northwest Lines.

Northwest Industries also studied the amount of Goodrich freight which presently passes over Northwest Lines and which could pass over Northwest Lines but which did not in 1968. This study was made at approximately the same time that Northwest announced its tender offer for Goodrich. Some time after January 15, 1969, Joseph A. Boehm, then a sales representative for the North Western in Cleveland, was instructed by his superiors to prepare a study of actual and potential Goodrich shipments over the North Western. Mr. Boehm was able to determine the actual amount of shipments from the sales records kept in the Cleveland office, but in order to determine the potential shipments he called Howard Cline, Traffic Operations Manager of Goodrich, on January 22, 1969. Mr. Cline refused to give him any information and Mr. Boehm therefore estimated the potential shipments of Goodrich. On January 31, 1969, Mr. Boehm was requested to come to Chicago for the purpose of working on an additional and further study of the actual and potential Goodrich shipments over the North Western.

Relying in part on the testimony of Goodrich's General Traffic Manager, the Government has asserted that by gaining control of Goodrich, Northwest will gain routing control over approximately $60 million of Goodrich and Ameripol

shipping and can use this routing control in order to aid its own rail lines. The contention is that by selecting certain railroads to carry Goodrich freight, Northwest could receive certain favors or advantages from these railroads. It is asserted that the railroads Northwest would select to carry Goodrich freight would turn over to Northwest Lines an equal amount of interline freight on a dollar for dollar basis, that these railroads would also turn over empty freight cars to Northwest Lines in times of freight car shortages, and that Northwest could induce the railroads which it selects to carry Goodrich freight to agree to rate changes in favor of either Goodrich or other Northwest shippers.

Explaining further how Northwest could favor Goodrich in several ways, and again relying on the testimony of Goodrich's general traffic manager, the Government states that Northwest could favor Goodrich as a shipper in terms of car supply, service, and expeditious routing. The Government contends that Northwest could sidetrack Goodrich freight cars thereby making it unnecessary for Goodrich to warehouse some of its products. It is also contended that Northwest could have other railroads specify B. F. Goodrich component parts for the railroad cars to be built for these other railroads, in exchange for Northwest shipping Goodrich freight over these other railroad lines. Yet another contention, reflected in testimony by Goodrich's General Traffic Manager, is that if Northwest gains control of Goodrich, it could where feasible, locate future Goodrich plants along Northwest Lines assuring itself of a portion of the shipments generated by these Goodrich plants and assuring Goodrich favored treatment as a shipper through rate making, car movements, car supply and expeditious routing.

The Government points in particular to the fact that the North Western and Milwaukee Road are the dominant railroad competitors in the State of Wisconsin. Evidence shows that the North

Western originates about 39% and terminates about 42% of the rail freight in the state and the Milwaukee Road originates about 35% and terminates about 31% .of the rail freight in the state. The North Western has about 38% of the ton miles and the Milwaukee Road has about 20% of the ton miles for the state. Out of a total of 59 Wisconsin communities with populations over 3,000 which do not have competitive rail service, 26 are served only by the North Western and 28 are served only by the Milwaukee Road. If the Northwestern-Milwaukee Road merger is effected, as now anticipated, there will be 73 communities with populations over 3,000 without competitive rail service, and 68 of these communities will be served only by the combined railroad.

The Government argues that if Northwest obtains stock control of Goodrich, Northwest's railroads may directly or indirectly induce a shipper to buy products offered by Northwest's non-transportation subsidiaries; or a shipper, on his own initiative, in the hope of insuring good rail service, may channel his purchases to the non-transportation subsidiaries of Northwest. Indicating the potential for activity of this sort, the Government has presented the following evidence:

(1) Packerland Packing Company, Green Bay, Wisconsin, is located on a North Western railroad siding and is served by the North Western and Milwaukee Road. Packerland ships meat and beef carcasses by rail. It is not economically feasible to ship all of these commodities by truck. Packerland requires special refrigerated piggy-back freight equipment which is in short supply, and Packerland has experienced difficulty in securing all of the necessary special equipment from the North Western. Packerland purchases plastic film to protect its meat during shipment. It expects that it will purchase $40,000 to $45,000 worth of this product in 1969. Packerland Packing also purchases tires for its over-the-road vehicles and its fleet of trucks. It expects to purchase $25,000 to $30,000 worth of tires in 1969. Goodrich manufactures and sells plastic film and tires. Packerland's representative testified that they would give consideration to purchasing their requirements of plastic film and tires from Goodrich if they thought it would help them obtain the necessary refrigerated piggy-back trailers.

(2) A major consumer of caustic soda in Wisconsin is the pulp and paper industry. Most of the pulp and paper producers are concentrated in two general areas of Wisconsin: one is the Fox River Valley around Green Bay, and the other is along the Wisconsin River. The North Western and the Milwaukee Road together or separately provide the only rail service to a number of the pulp and paper producers in the Fox River Valley and the Wisconsin River area who are presently buying caustic soda from Wyandotte Chemical Corp. at Port Edwards, Wisconsin. Ninety-five per cent of Wyandotte's shipments from its Port Edwards, Wisconsin chlor-alkali plant go by rail. Goodrich sells synthetic rubber and plastic latexes and intends to sell caustic soda to pulp and paper companies in Wisconsin. Returns on caustic sales to Wisconsin area consumers would be low for Goodrich if it shipped directly out of Calvert City, Kentucky, by rail. However, this situation could improve if Goodrich shipped to Chicago by water and then by rail to Wisconsin.

Northwest challenges the validity of the studies and claims of potential diversion presented by the Government. Specifically, Northwest refers to evidence of a traffic study conducted by Goodrich and the latter's estimate based thereon that in the year 1968 approximately $2.5 million in freight revenue could have been diverted from truck carriers, and approximately $2.25 million plus an additional $130,000 could have been diverted from railroads, for the benefit of the North Western and the Milwaukee Road, of which total amount of $4.8 mil-

lion the North Western and the Milwaukee Road would have received approximately 75%, or $3.6 million. Northwest also specifically refers to Government evidence of diversion studies made by truck operators who handled Goodrich traffic in 1968 and estimates based thereon that Goodrich traffic could be diverted from those truck operators to the North Western and the Milwaukee Road. Northwest contends that these diversion studies have the following shortcomings:

(a) Some of the rail routes which are assumed to be usable in order to divert traffic to the North Western or the Milwaukee Road are so circuitous that use of these routes would appear to be highly unlikely because of the time delay which would result. It is not possible to determine at this stage of the case, the proportion of such assumed diversion routes that are unduly circuitous.

(b) The Northwestern and the Milwaukee Road do not accept less-than-carload shipments. For this reason, Goodrich excluded from its diversion study all shipments of less than 10,000 pounds. Carload rates on tires, however, are based upon a 30,000 pound minimum. Because tire shipments are relatively low in weight in relation to their volume, most other commodities in Goodrich's traffic study would have had higher carload weights than tires. Flaps, for example, weigh 75,000 pounds per carload. Since Goodrich assumed in its study that each shipment in excess of 10,000 pounds was divertible from truck to rail, many shipments thus included would have been divertible only if consolidated with other shipments. This would either have involved delays or be totally impractical. It appears that one reason Goodrich now uses truck rather than rail for certain shipments despite a substantially higher freight rate is the necessity for speed in delivery. In the trucker diversion studies, no consideration whatsoever was given to the carload minimum applicable to rail shipping, the only evidence available being that many shipments assumed to be divertible were substantially below the 10,000 pound figure.

(c) The 25% which the Goodrich estimate discounted the $4.8 million assumed to be divertible to the North Western and the Milwaukee Road was at one point explained by Goodrich's General Traffic Manager, who directed the diversion study, as representing that part of the traffic that would not be controlled by the Goodrich Traffic Department for reasons such as circuitous route, customers' wishes, and inadequate service on the diversion route. At another point he explained the 25% reduction as having been made to cover the division of revenues which would be received by railroads other than North Western or the Milwaukee Road on joint hauls. Goodrich's Traffic Operations Manager, who also supervised the diversion study, testified that the figure of $4.8 million represented the share of the North Western and the Milwaukee Road after the division of revenues with other railroads, which was contradictory of the General Traffic Manager's testimony (and affidavit filed in support of the motion for preliminary injunction) that the $4.8 million represented the gross amount that would be taken away from the truckers and other railroads.

Northwest has also presented evidence and argument that casts a different light on the reasons for the diversion study which it conducted. Northwest's evidence is that, as a result of a statement made on January 20, 1969 by Mr. Keener, Chairman of Goodrich, that he believed there were substantial antitrust problems involved in the acquisition of Goodrich, Mr. Heineman, assuming that shipping was probably the subject Mr. Keener was alluding to, ordered a study to determine the maximum amount of Goodrich traffic which could be diverted from other carriers to the North Western. Northwest maintains that this study was conducted solely for the purpose of determining if there were

any antitrust problems because of Northwest's ownership of the North Western Railroad and was conducted under the supervision of Northwest's counsel, not its sales department. Mr. Heineman testified that the study showed that the maximum number of Goodrich cars which could be diverted from other railroads to the North Western was approximately 700, and that the North Western Railroad handles approximately 1,500,000 cars annually. He concluded, therefore, that the antitrust issue, so far as shipping was concerned, was de minimus.

Northwest also points out that many of the exploitations which the Government suggests Northwest might make of its control of Goodrich would constitute violations of existing statutes and regulations of the Interstate Commerce Commission governing transportation practices as well as the antitrust laws.

As the foregoing narrative statement of facts discloses, the Government urges that the evidence presented at the hearings on its motion for a preliminary injunction demonstrates that it will probably prevail at the trial on the merits. In support of this conclusion, it asserts that the evidence reveals numerous anti-competitive results which may be reasonably anticipated from the acquisition of Goodrich by Northwest. These include, the Government contends, traditional horizontal and vertical elimination of existing competition, further elimination of existing competition through reciprocity and what it calls "reciprocity effect," elimination of potential future competition between Goodrich and Northwest, and, finally, the alleged anti-competitive effect of the combination of two of the largest conglomerates in the economy.

To assess the accuracy of the forecast as to the reasonable probability of success which the Government foresees, it is necessary to examine and evaluate the evidence with respect to each of the areas of anti-competitive results which it has urged are implicit in the acquisition. As previously indicated they are numerous, and the quantity and quality of evidence presented varies greatly between them.

## CAUSTIC SODA

The first to be considered is caustic soda as to which more evidence was perhaps presented than as to any other product. Caustic soda (sodium hydroxide) is manufactured by Goodrich at its plant in Calvert City, Kentucky, and by Northwest's subsidiary, Velsicol, at its plant in Memphis, Tennessee. In 1968, in the geographic area in which Goodrich sells the bulk of its production, it accounted for 10.8% while Velsicol sales represented 2.6% of the total. This area, which the Government has designated the Inland Waterway Area, includes what is generally considered the Mississippi River inland waterway but excluding the Mississippi Delta-Gulf Coast region from Baton Rouge, Louisiana, south.

At the present time, Goodrich is the third largest and Velsicol the eleventh largest seller in the area. Both contemplate increases in production in 1969. Their combined sales in 1968 represented 13.44% of the total caustic sales in the area, and the combined unit would have been the second largest caustic soda seller in the area.

The Government urges that, in the light of recent United States Supreme Court interpretations of Section 7, the potential elimination of competition by virtue of the horizontal caustic soda aspects of the acquisition is sufficient in itself to warrant the issuance of the preliminary injunction. In United States v. Pabst Brewing Co., et al., 384 U.S. 546, 549, 86 S.Ct. 1665, 1667, 16 L.Ed.2d 765 (1966), the Court held that the Section 7 requirement of a lessening of competition "in any section of the country" means that the Government must establish "a substantial anti-competitive effect somewhere in the United States * * *." In *Pabst*, the Court considered three areas: the State of Wisconsin, the three state area of Wisconsin, Illinois and Michigan, and, finally, the

entire United States. In the State of Wisconsin, the combination of Pabst and Blatz would have given the merged companies 23.95% of the total beer market. The comparable three state and national percentages were 11.32% and 4.49%. The Court held that all three, given the trend of concentration in the beer industry, constituted Section 7 violations.

In United States v. Von's Grocery Co., 384 U.S. 270, 86 S.Ct. 1478, 16 L.Ed.2d 555 (1966), the Court found that the proposed acquisition and combination of two local grocery chains which together had 7.5% of total grocery sales in the Los Angeles area, in light of the progressive elimination of competing individually owned stores and other small chains, warranted enjoining the transaction as violative of Section 7.

Based on the statistics of Pabst and Von's, the Government urges that the acquisition of Goodrich by Northwest presumptively violates Section 7. Northwest, on the other hand, challenges the validity of the geographical market area selected by the Government on a number of grounds, urging that it is a "gerrymandered" market selected primarily because it is the area in which Goodrich currently sells 95% of its production.

Moreover, Northwest contends that, even if the Government's inland waterway area is accepted as a relevant market area under Pabst, supra, the acquisition would be within the Department of Justice Guidelines (issued in May 1968) since the inland waterway caustic soda market is not a "highly concentrated" one in which the top four firms in the aggregate have 75% of the total market, but is a "less highly concentrated" one for which the Guidelines proscribe acquisitions between companies having 15% and 3% or more of the market respectively. Northwest points out that the comparable figures here are 10.-79% and 2.65%. The Government's response to this argument is that Northwest has misinterpreted the purpose and significance of the Guidelines. Rather than defining "safe" acquisitions, the Guidelines, says the Government, are intended to be "red flags" warning that acquisitions, which exceed the specified limits will be attacked but not insuring that those below the applicable limits may not also be challenged as anti-competitive and violative of the antitrust laws. Any other interpretation would constitute a modification both of the Sherman and Clayton Acts and the court decisions thereunder.

On the basis of the record before it, the Court is unable to determine whether the inland waterway area selected by the Government and based on Goodrich's sales and distribution from its Calvert City, Kentucky plant is a relevant market area. Details as to the location and volume of purchases not only of Goodrich customers but of other producers, including Northwest's subsidiary, Velsicol, apparently are not now available and, accordingly, were not introduced into evidence. Nor is there any evidence as to whether the caustic soda industry is tending towards concentration as is the beer industry involved in Pabst, or the retail grocery business in the Los Angeles area involved in Von's Grocery.

In light of the facts that their plants are only two hundred miles apart and shipping costs are a substantial factor in caustic soda sales, a detailed analysis of their respective sales may indicate a relevant market area much smaller than the so-called inland waterway area. Alternatively, it is possible that Northwest's experts' conclusion that the effective market area includes the Mississippi Delta-Gulf Coast producers and consumers will, on more careful examination, prove correct. Or it may be that the Government's inland waterway area is the most relevant market area. Finally, it must be recognized, particularly in the light of Pabst, that more detailed analysis may demonstrate more than one "section of the country" in which the proposed acquisition will have an effect on competition in the caustic soda field.

It follows from all of the foregoing that on the basis of the present record it

is impossible for the Court to predict that, on the basis of the probable effect of the acquisition on competition in the sale of caustic soda alone, there is a reasonable probability that the Government will ultimately prevail. On the other hand, it must be apparent that given an opportunity to obtain and present more detailed information on the subject, the Government may demonstrate such a substantial actual and potential anti-competitive effect as to constitute a Section 7 violation.

## MURIATIC ACID, HCPD AND OTHER CHEMICALS

As previously set forth, it is estimated that Velsicol will produce some 62,000 short tons of muriatic acid in 1969, but the record is even more incomplete than in regard to caustic soda as to where and in what quantities its sales will be made. Goodrich is definitely studying entry into the muriatic acid market but the economic feasibility of its so doing is still in question. A 1966 Goodrich study led the company to conclude that oversupply and other factors made entry unwise.

On the basis of the present record, there is no way in which a relevant market area for muriatic acid, or the number of producers and sellers therein, can be determined. As in the case of caustic soda, further information may well demonstrate that the proposed acquisition may have either a significant or an insignificant potential anti-competitive effect. What the probabilities are, however, is impossible to predict.

The same situation exists with respect to HPCD (hexachlorocyclopentadiene) and other chemicals such as petroleum resins and benzoflex varieties of plasticizers now made by Velsicol and of which the Government suggests Goodrich is a potential producer whose competition might be eliminated by the acquisition. The present evidence with respect to all of these is too meager to permit any prediction as to the probability of the Government's ultimate success.

In this connection, although the Government has not suggested any specific chemical products now manufactured by Goodrich which Velsicol is considering producing, further investigation may reveal that there are such and the question of elimination of potential competition with respect to them may also arise.

### PVC

The Government's contention with respect to PVC (polyvinyl chloride) is that the acquisition has both horizontal and vertical anti-competitive potential. Goodrich, one of two companies which pioneered in the development of applications and markets for PVC, is now the leading producer in the country with approximately 20% of the market. There are more than 100 varieties of PVC resin manufactured in the United States. Goodrich also pioneered the use of PVC for rigid end use applications, such as plastic pipe, and was the leading source of the PVC used for such applications in 1968 with 40% of the total sales. The top four producers of PVC for rigid end uses accounted for more than two-thirds of total sales in 1968.

In addition to being the leading producer of PVC resins, Goodrich is also a user, manufacturing plastic pipe at its Marietta, Ohio plant. Northwest, through its Lone Star Steel subsidiary, is contemplating manufacturing and selling plastic pipe and has consulted Goodrich as to the techniques involved and the possibility of purchasing PVC for rigid end uses.

Again the record before the court leaves a number of unanswered questions. Could Lone Star and Goodrich compete in the sale of plastic pipe, or does the distance between Ohio and Texas preclude such competition? Are there other suppliers of PVC from whom it would be more economical for Lone Star to purchase its PVC requirements? Does Velsicol now manufacture, or is it contemplating producing any of the chemicals utilized in the manufacture of plastic pipe, including PVC? Without the answers to these

and other questions concerning the manufacture and sale of PVC and plastic pipe, the reasonable probability of the Government's success in establishing that the proposed acquisition would have a substantial anti-competitive effect in some section of the country is difficult to evaluate though the possibility of its so doing is apparent.

In addition to the possible vertical relationship between Goodrich and Lone Star with respect to PVC for use in the manufacture of plastic pipe, two of Northwest's subsidiaries are current users of PVC. In 1968, Universal Manufacturing purchased 2,250,000 lbs. at a cost of $388,000 for use in making wire insulation, and estimates that its 1969 purchases will be 2,750,000 lbs. at a cost of approximately $480,000.00. Acme Boot, in 1968, purchased 266,125 lbs. at a cost of $53,178 for use in its new patented U-Nexus boot construction process, and estimates its 1969 purchases as 418,435 lbs. at a cost of $84,000.00.

The record does not disclose the extent of either subsidiary's past purchases of PVC from Goodrich and other suppliers nor indicate the extent to which Goodrich could supply the PVC requirements of either. Under the circumstances, a prognosis as to the probability of the ultimate result so far as the potential anti-competitive effects of the acquisition in the PVC field is concerned, is most difficult. There are, however, a number of vertical possibilities of such an effect, any one of which would constitute a violation of Section 7.

## CO-PRODUCT RESIN STREAM

In July of 1968, Goodrich's subsidiary, Ameripol, initiated a series of conversations with Northwest's Velsicol concerning the possible purchase by the latter of the by-product resin stream from Ameripol's Port Neches, Texas plant. A sample was provided Velsicol in February 1969. The record is unclear as to whether the sample met Velsicol's requirements. In any event, sales contact was suspended by Ameripol because of the proposed tender offer. Again the record is incomplete as to essential facts concerning the probability of Velsicol's purchasing Ameripol's co-product resin stream apart from Northwest's acquisition of Goodrich, but it is obvious that such acquisition would not adversely effect the possibility thereof.

## FOOTWEAR

As previously set forth in considerable detail, Northwest's subsidiary, Acme Boot Company, Inc., and the latter's subsidiary, Joseph F. Corcoran Shoe Co., Inc., are substantial producers of footwear, particularly boots. Similarly, Goodrich manufactures a broad line of footwear, some of which is similar to and competitive with that sold by Northwest's subsidiaries but most of which is not, although the footwear products of both are distributed largely through similar channels and frequently the same retail outlets. In addition, canvas and casual footwear, of which Goodrich is the nation's second largest producer, are frequently sold as matching items with wearing apparel, particularly sports or casual clothes. Both Union Underwear and Imperial-Reading, Northwest subsidiaries, are substantial manufacturers of such wearing apparel.

If the footwear sales of combined Northwest-Goodrich were distributed jointly, a much broader line could be offered than either possesses at present which would strengthen their competitive position as against other footwear manufacturers unable to offer as comprehensive a line.

## SHOE COMPONENTS

In 1968, Goodrich was the country's third largest producer and seller of shoe components (heels, soles and sole sheets) with sales totalling $12 million, representing 13.8% of the total market. Acme is a large user of shoe components though its principal supplier has historically been Goodyear from whom it purchased over $1 million of shoe components in 1968, making it one of Good-

year's ten largest shoe component customers. In the same year, Acme purchased some $430,000 of shoe components from Goodrich.

Acme, in its footwear operations, purchases approximately $600,000 annually of the leather substitute "Corfam" from duPont. Goodrich has developed and is now selling a similar synthetic called "Aztran" which it claims is superior to "Corfam."

Finally, as previously discussed, Goodrich is one of the largest producers of PVC (polyvinyl chloride). Acme owns a patented process called "U–Nexus" in which PVC is injected between the footwear sole and the upper to form a waterproof bond between the two.

The potential for switching from Acme's present suppliers to Goodrich for at least some of these items is apparent although details are lacking as to the extent to which substitution of Goodrich products is practically and economically feasible.

## RAILROAD SUPPLIES

Goodrich manufactures and sells a number of products used by railroads and railroad car manufacturers, including flat and V-belts, molded and coated products, industrial protective clothing, shoes, gloves and rainwear. There is no evidence as to Northwest's purchases of these items or the identity of its present suppliers. Moreover, Northwest insists that it never specifies manufacturers of components when ordering new cars but purchases such cars only on the basis of quality and price without regard to component suppliers.

Again, it is impossible on the basis of the present record to measure the anti-competitive potential of a Northwest-Goodrich affiliation though the possibility thereof is clear.

## YARN

As the detailed findings heretofore made reveal, Goodrich is a large producer of cotton yarn and is at present the major supplier of Northwest's subsidiary, Union Underwear. Apparently, Goodrich could furnish Union with its entire yarn requirements, perhaps at a reduction in price, since a price differential between open market purchasers and so-called captive sales is customary in the yarn market.

Unfortunately, the evidence is too sketchy to enable a determination of the anti-competitive potential, if any, of Northwest's acquisition of Goodrich on either yarn sales or the ultimate finished goods market.

## FREIGHT AND FREIGHT RECIPROCITY

Substantial general evidence was presented by the Government as to the possibility of diversion from present carriers, both rail and truck, either to rail routings in which Northwest's rail lines would be at least an interline carrier or to railroads which would reciprocate. The total annual shipping charges paid by Goodrich and its affiliates in 1968 was approximately $60,000,000.

The diversion estimates presented were general and inconclusive. Moreover, it is apparent that much of Goodrich's truck shipments could not be diverted to rail and the rerouting of Goodrich's present rail shipments to include Northwest's railroads as interline carriers would substantially delay deliveries. Once again, the anti-competitive potential of the proposed acquisition is not determinable on the basis of the present record, although the possibility thereof certainly exists.

As to the possibility of reciprocity arising from Northwest control of Goodrich shipping, the Government urges two general areas. First, it suggests that Northwest could secure freight shipments from other rail carriers in exchange for routing Goodrich shipments over such carriers' lines. Second, it suggests that because rail service is frequently limited to a single carrier, shippers in the areas serviced exclusively by Northwest's railroads might purchase

Goodrich products in the hope of securing better rail service. This latter the Government denominates "reciprocity effect" as distinguished from direct reciprocity.

## RECIPROCITY AND RECIPROCITY EFFECT

"Reciprocity", as the term has been used in this case, refers to a seller's practice of utilizing the volume or potential volume of its purchases to induce others to purchase its products in preference to those of its competitors. "Reciprocity effect", as the term has been used in this case, refers to the tendency of a firm desiring to sell to another company to channel its purchases to that company.

There has been evidence that the practice of reciprocity has been increasing in the American economy since the end of World War II; and it is clear that increasing aggregate concentration and mergers of large companies result in increased opportunities for reciprocity, encouraging the exchange of reciprocal favors and tending to discourage new enterprises from entering an industry. Indeed, opportunities for reciprocity increase geometrically as an enterprise becomes larger and more diversified.

Many firms consider the net effect of reciprocity to be advantageous and profitable. Reciprocity occurs most frequently in oligopolistic markets or concentrated markets where price competition is dull. Many large corporations have a trade relations manager in both the purchasing and sales area. The responsibility of the trade relations manager is to coordinate the area of reciprocal buying. Reciprocity can, however, take place, although not as effectively, without complete coordination at the top.

The Government notes that if Northwest acquires stock control of Goodrich, Northwest's already substantial volume of purchases will be increased by about $440 million annually. The Government also notes and has presented evidence that customers or suppliers of Goodrich and Northwest practice reciprocity.

For instance, evidence presented by the Government indicates that Alcoa Corporation has a definite written policy favoring reciprocal dealings when price, quality and service are said to be equal between two or more competing suppliers. It appears that it is common for trade relations personnel of Alcoa to meet and discuss policy with trade relations personnel of other large corporations. There has been testimony that Alcoa has had conversations with Goodrich's trade relations personnel throughout the years. Northwest in its present size and relationship to Alcoa may not be big enough to get involved in the Alcoa reciprocity program, but it appears that the combined corporation of Northwest and B. F. Goodrich would represent a large enough area of commerce for Alcoa to concern itself with reciprocal relations with Northwest. In 1968, B F. Goodrich purchased $1,487,000 worth of products from Alcoa, while Northwest purchased $237,000 for a total of $1,724,000 worth of purchases by both. Total sales to Alcoa by both B. F. Goodrich and Northwest were $1,405,000, leaving an excess of purchases by Goodrich and Northwest from Alcoa over sales to Alcoa of approximately $319,000.00. It appears that Alcoa could potentially purchase about $3 million worth of products from present B. F. Goodrich and approximately one-half million dollars worth of products from present Northwest.

Clement O. Davidson, Vice President of Columbia Carbon Co., a subsidiary of Cities Service (Citgo), stated that "all things being equal," reciprocity plays an important role in Columbia's purchasing policy. Cities Service sold $2.2 million more than it purchased to a combined Northwest-Goodrich in 1968, and it appears that Cities Service is a potential purchaser in the amount of approximately $20 million.

Evidence submitted by the Government also indicates that among the large

companies which practice reciprocity are duPont, Humble Oil, Enjay Chemical Company, Monsanto, Pittsburgh Plate Glass Company and Texaco. In addition, it indicates that Container Corporation of America practices reciprocity with Mobil, American Oil, Monsanto, Shell and Tenneco. All of these companies are either customers or suppliers or both of Goodrich and Northwest. In each case they appear to sell more to the Goodrich-Northwest combination than they buy. In most of these cases, there appear to be substantial numbers of products which these companies could purchase from Goodrich and Northwest.

The Government contends that Velsicol Chemical Corporation, a wholly-owned subsidiary of defendant Northwest, Inc., is now and has been engaged in a full scale and vigorous reciprocity program. The Government notes that a February 16, 1967 memorandum from W. C. Goodwine to Howard F. Reeves, presently Vice President—manufacturing and engineering of Velsicol, indicates that Velsicol was interested in pursuing "trade relations" with FMC Corporation. The Government has submitted evidence to support the contention that William T. Rossiter, Vice President—marketing of Velsicol, has directed an important part of Velsicol's reciprocity program and that his reciprocity activities had been conducted with the knowledge of and implied concurrence of N. E. Hathaway, President of Velsicol until January of 1969 when Mr. Hathaway died. Mr. Heineman, President and Chief Executive Officer of Northwest, in August of 1966 made the appointment of Hathaway as President of Velsicol, effective December 31, 1966. On August 15, 1968, William T. Rossiter, on the recommendation of Mr. Heineman as a "key executive" was granted by the Board of Directors of Northwest a stock option for 1,100 shares of Northwest stock.

The Government has also submitted evidence in support of the contention that Howard F. Reeves, Jr., Vice President—manufacturing and engineering of Velsicol, has also been actively engaged in Velsicol's reciprocity activities. On August 15, 1968, Howard F. Reeves, Jr., on the recommendation of Mr. Heineman, was also as a "key executive" granted by the Board of Directors of Northwest a stock option, in this instance, for 1,250 shares of Northwest stock.

The Government has submitted evidence that William T. Rossiter, Vice President—marketing of Velsicol, as recently as September 24, 1968, sent to Velsicol sales personnel "a list of Velsicol's top 50 suppliers, and the sales we (Velsicol) made to them." Mr. Rossiter's memorandum in regard to this list, which is under the heading "CUSTOMER SUPPLIER RELATIONS," states, in pertinent part, that:

I recognize that just because we are purchasing significant amounts from a company is no reason they should automatically have need for a corresponding amount of our products. However, if some of these accounts have the potential to buy more, I am sure a well organized sales approach could produce additional sales and profits.

Please review this list and drop me a note on those customers where a plan might help. I would be pleased to work with you on them.

The Government has submitted evidence that the aforementioned list of Velsicol's raw material purchases and sales for 1967 was passed on by at least one of the sales personnel, Mr. R. M. Hasterlik, to Messrs. M. W. Donahue, W. C. Goodwine and E. B. Lukas, who are also Velsicol sales personnel. The Government notes that Mr. Hasterlik inferred that Velsicol could achieve increased sales to suppliers based on Velsicol's purchases from these suppliers but that this information "is to be used with careful discretion" because "trade relations is a double edge sword," that is, Velsicol's customers could use this information to sell their products to Velsicol through reciprocity efforts.

The Government has also submitted evidence to support the following contentions. (1) That in 1967, after Velsicol acquired Retzlaff Chemical, W. C. Goodwine of Velsicol and Dr. C. A. Lynch, Jr., of Velsicol's development staff suggested that Retzlaff Chemical's purchases could be used as a vehicle for improving Velsicol's trade relations position with FMC Corp., as FMC Corp. "is the major supplier" of a chemical sold to Retzlaff Chemical. (2) That from at least April 7, 1965 to at least as recently as March 31, 1969, Velsicol sales personnel have vigorously attempted to obtain increased Velsicol sales to the Dow Chemical Co. on the basis of reciprocity and that these reciprocity efforts have directly involved Howard F. Reeves, Jr., Vice President—manufacturing and engineering of Velsicol, and the following other Velsicol personnel: M. W. Donahue, Edward B. Lukas, Elton Dornbusch, Stuart A. Johnson, Ralph J. Mott, R. M. Hasterlik, and Art Conor. According to the Dun & Bradstreet Million Dollar Directory, 1969, at page 1757, Stuart Johnson is the Velsicol Officer in Charge of Purchasing and Robert Hasterlik is the Officer in Charge of Sales of Velsicol's Industrial Chemicals Division. (3) That Stuart Johnson, Officer in Charge of Purchasing at Velsicol, and Robert Hasterlik, Officer in Charge of Sales of Velsicol's Industrial Chemicals Division, have worked together to increase Velsicol's sales of muriatic acid through reciprocity from at least March 28, 1967, to at least as recently as January 10, 1968. (4) That Reichhold Chemicals Co. sold methanol to Velsicol and, on a reciprocity sales basis, tried to sell Velsicol a portion of Velsicol's maleic anhydride requirements. (5) That in a memorandum to M. W. Donahue, dated February 7, 1966, S. A. Johnson, Officer in Charge of Purchasing at Velsicol, stated, in pertinent part, that "we are not able, at this time, to give Reichhold any encouragement in supplying a portion of our Maleic Anhydride requirements" because "historically" Velsicol has "been working closely with Petro Tex" Chemical Corp. but that "Allied Chemical has indicated that they approve our product in their application" and "should Allied become a customer of our Chlorendic Anhydride, we shall have to purchase from them at least, the amount of Maleic Anhydride which would be used in making the quantity of Chlorendic Anhydride that they purchase." That, however, Mr. Johnson told Mr. Donahue that "we might have some room to work with Reichhold this year" and that "we (Velsicol's purchasing department) will keep your relationship with Reichhold in mind, and when we see our way clear, we will seriously consider favoring Reichhold with a portion of our Maleic Anhydride business."

In 1967, Tenneco was Velsicol's fifth largest supplier. In 1967, Velsicol's purchases from Tenneco totaled $782,206 and Velsicol's sales to Tenneco totaled $420,450. In 1967, Allied Chemical was Velsicol's twenty-ninth largest supplier, and Velsicol's purchases from Allied Chemicals totaled $92,728 while Velsicol's sales to Allied Chemical totaled $572,853. In 1967, Reichhold Chemicals was Velsicol's thirty-seventh largest supplier, and Velsicol's purchases from Reichhold totaled $58,658 while Velsicol's sales to Reichhold totaled $201,341.00.

The Government has also submitted evidence to substantiate the following. That in 1965, contrary to alleged instructions of Ben W. Heineman, now President and Chief Executive Officer of Northwest and in 1965 Chairman of North Western, the North Western purchased paper grain doors on the basis of reciprocity. That by memorandum dated January 14, 1965, R. C. Stubbs, Acting Vice President—Traffic of the North Western, was informed of the North Western's 1965 purchases of grain doors from International Stanley and Signode and the "traffic values of the(se) two firms involved for 11 months of 1964." That by letter dated February 10, 1965, R. C. Stubbs, Acting Vice President—Traffic of the North

Western wrote to H. G. Whitman, Traffic Manager of Thilmany Pulp & Paper Co., Kaukauna, Wisconsin, "concerning our use of paper grain doors" stating that:

> Pursuant to our promise, we have not lost sight of this matter, and I am pleased to advise that effective immediately Signode doors will be stocked for use on our M&SL (Minneapolis and St. Louis) Division. The result will be a significant increase in our purchases from Signode which will, of course, in turn benefit your good company.

That an almost identical letter was sent on this same date by Mr. Stubbs to O. H. Miller, Vice President—Traffic & Distribution, Scott Paper Co., Philadelphia. That a copy of this letter was sent to Mr. S. B. Boardman, who Mr. Heineman referred to in his testimony as "a traffic officer with supervisory responsibility" at the North Western. That by letter dated February 15, 1965, H. G. Whitman of Thilmany Pulp & Paper Co. wrote Mr. R. C. Stubbs, Acting Vice President—Traffic of the North Western, stating:

> Thanks much for your February 10 letter advising that the C&NW will stock Signode doors on the M&SL division. Your cooperation in continuing to keep our interests in mind is much appreciated.

> Thilmany's total tonnage in 1964 increased 6% over 1963, but perhaps what is of more interest to you is that we are continually reaching further away from the mill to lay our finished product down with the resultant greater rail earnings. The year 1965 seems to be holding this same pace with probable still further increases.

> We will continue our efforts to provide the C&NW with their longest haul in all possible circumstances.

Finally, the Government contends that Lone Star Steel Co. entered into a contract to purchase coal from the Kerr-McGee Oil Corp. on the implied condition that Kerr-McGee purchase tubular products from Lone Star. The Government refers to the deposition of Max R. Dodson, Executive Vice President of Lone Star Steel, as its evidence that this reciprocity arrangement was negotiated for Lone Star by Mr. Dodson, Mr. Love, President of Kerr-McGee, Mr. Gossard, head of Kerr-McGee's coal mining department, and one other man from Kerr-McGee, that the Lone Star conversation with Kerr-McGee in regard to coal and tubular products took place "approximately three years ago," but that although Kerr-McGee has already started up a mine to produce this coal, and Lone Star's purchases of the coal subject to this contract have not yet begun, Northwest has not cancelled the contract.

Mr. Dodson testified that Lone Star's purchasing department has received copies of tabulations of Lone Star's customers. The Government contends that Lone Star used its buying power from Kerr-McGee to sell Kerr-McGee tubular products which, as Mr. Dodson testified, Lone Star had never been able to sell to Kerr-McGee before. The Government also notes that on August 15, 1968, Max R. Dodson, on the recommendation of Ben W. Heineman was granted by the Board of Directors of Northwest, as a "key executive," a stock option for 2,500 shares of Northwest stock.

Mr. Ben W. Heineman, now President and Chief Executive Officer of Northwest, testified that it has a policy against reciprocal dealing, considers such a practice uneconomic, and has no machinery for effectuating that practice. Mr. Heineman recalled that when he became President of the North Western in 1956, he found that the company was engaged in the practice of reciprocity, for example, that railroad scrap was sold on the basis of reciprocity and locomotives and freight cars were purchased on a reciprocal basis. Mr. Heineman testified that upon taking over the operation of the North Western, he prohibited all reciprocity. With respect to the

operation of Northwest, he stated that because of the manner in which Northwest treats its operating subsidiaries as separate profit centers, with the management of each such center having a substantial financial stake in its profits, there is no likelihood of any increase in reciprocal dealing power or the practice of reciprocity resulting from the interplay of the purchases and sales of each of the separate operating companies, including defendant Goodrich. And finally, it is the position of Northwest and Mr. Heineman that it is not likely that potential suppliers of Northwest would purchase products from Northwest in the expectation of obtaining "reciprocity effects," since these expectations would be disappointed in view of Northwest's policy against reciprocal dealing and suppliers would soon be aware of that policy.

It is nevertheless the case, however, that while the President of Northwest testified that the company had a policy against the use of reciprocity, he did not know of any written statement of such policy that has ever been disseminated to the various companies within Northwest. A statement of anti-reciprocity policy appeared for the first time in Northwest's April 16, 1969 prospectus, after the subject was ignored in earlier versions filed with the SEC, and ignored in the November 1968 Milwaukee Road prospectus.

In the light of the various documents taken from the files of Northwest subsidiaries and the testimony of officers thereof, it is apparent that any comprehensive policy against reciprocity is a fairly recent development and a reflection of the personal philosophy of Mr. Heineman.

## ACQUISITION POLICY

The Government has presented evidence to support its contention that, in the words of a document subpoenaed from its files, Northwest is "pursuing an aggressive acquisition policy which is

both vertically and horizontally complementary" to Northwest's present operations. That is to say, in the more conventional term of art, the Government's position is that Northwest has consciously sought to acquire firms which "fit" in with Northwest's present operations. The evidence submitted relates primarily to Northwest's consideration of various corporations not acquired. The prospective acquisition of Goodrich is consistent with the policy in question.

## CONCENTRATION

On the basis of the testimony of its expert witnesses and other evidence it has placed before the Court, the Government has articulated the following description and contentions as to the development of concentration in industry in the United States and the consequences thereof.

In 1948, the 200 largest manufacturing corporations in the United States held 48.3% of total manufacturing assets. In 1968, 61.2% of the manufacturing assets were held by the 200 largest corporations. In this twenty-one year period, therefore, the percentage of assets held by the 200 largest corporations increased by 12.9% or a net increase over 1948 of 26%. During this same twenty-one year period the percentage of assets held by the 100 largest manufacturing corporations increased from 40.3% to 49.5%, an increase of 9.2 percentage points or a net increase over 1948 of 23%.

During the period 1948 to 1965, the share of manufacturing, mining and merchandising assets held by the 200 largest corporations increased from 29.3% to 38.0%, a net increase over 1948 of 29.7%. During the same period, the share of these assets increased from 24.0% to 30.7%, a net increase over 1948 of 27.9%.

During the period between 1947 and 1966, the per cent value added by the 200 largest manufacturing corporations increased from 30% to 42%. During

the same period, the per cent of value added by the 100 largest manufacturing corporations increased from 23% to 33%.

Another measure of the increased concentration is that between 1948 and 1966 approximately 919 manufacturing and mining firms with assets of over $10 million and with combined assets of about $31 billion were absorbed by other firms through merger and acquisitions.

The recent acceleration in the merger movement is corroborated by data showing that the number of recorded mergers and acquisitions increased from 1345 in 1960 to 2384 in 1967 and 4003 in 1968. Likewise, the number and magnitude of assets acquired in transactions involving acquisitions of units with assets of $10,000,000 or more increased as follows:

| Year | Number | Total Assets Acquired (Millions) |
|---|---|---|
| 1948 | 6 | $ 130 |
| 1960 | 62 | 1,710 |
| 1967 | 169 | 8,222 |
| 1968 | 192 | 12,616 |

Among firms engaged in mining and manufacturing, acquired assets (in transactions involving acquisitions of firms with assets of $10,000,000 or more) as a per cent of new investment in manufacturing and mining have increased substantially in the years since 1948, as shown by the following table:

| Year | New Investment | Acquired Assets | Acquired Assets as per cent of New Investment |
|---|---|---|---|
| | (Amounts shown in Billions of Dollars) | | |
| 1948 | $10.01 | $ .13 | 1.3 |
| 1960 | 15.47 | 1.71 | 11.1 |
| 1967 | 28.11 | 8.22 | 29.2 |
| 1968 | 28.27 | 12.61 | 44.6 |

The United States is presently experiencing a wave of corporate mergers and acquisitions unparalleled in its history in terms of duration, number of firms involved, and amount of assets acquired. It has most recently increasingly involved so-called conglomerate mergers, and it has increasingly involved takeovers of corporations with assets in excess of $250 million. Between 1948 and 1965 there were only three such acquisitions. Since 1966, however, these types of acquisitions have been increasing in a geometric progression. In 1966 there were three acquisitions of this type, in 1967 there were six, and in 1968 there were twelve.

If Northwest acquires control of Goodrich, with assets in excess of $1 billion, Goodrich will be the second largest United States corporation to have been taken over by another company, at least since 1948. The Government contends and its experts have stated as the probable adverse effects of such an acquisition and the concentration trend in general the following.

Very large firms are potential entrants into concentrated industries, because these firms have access to the capital that is necessary to enter these types of industries. When two very large firms merge, both the acquired and the acquiring company are eliminated as potential entrants into the concentrated markets occupied by the other.

The acquisition of a very large firm by another eliminates it as an independent decision-making center capable of deciding to enter a concentrated industry by internal expansion or acquisition of a small company. Entry by internal

growth adds an additional competitive force to an industry and creates new plant equipment and technology.

When two very large firms merge, the resulting combination tends to entrench the position which these firms hold among the leading producers in the concentrated markets because their combined financial resources increase their power, thereby reducing the likelihood of new entrants into the market and diminishing the incentive among small firms within those concentrated markets to compete aggressively, since they fear retaliation.

Very large firms have substantial market leverage because of their size and the diversity of the markets they are engaged in. Growth by acquisition of another very large firm sharply increases the market leverage of these firms. This increases the opportunity for reciprocity and reciprocity effect because the merged firm has greater buying power and more separate product lines to sell.

As firms become larger and more diversified, these firms find that they are increasingly in supplier and customer relationship with each other. These relationships create the opportunity for reciprocity and reciprocity effect.

The merger of two very large diversified firms contributes significantly to the recent sharp increase in aggregate concentration of all manufacturing assets. By placing control of a substantial part of our economy under fewer decision-making centers, they form an increasing number of business relationships with each other as their diversified holdings expand (as competitors, as buyer-seller, as joint venturers, as interlocking directors, etc.). These business relationships tend to establish a harmonious community of interest among these very large firms which impel them to oligopolistic behavior. Aggressive pricing undertaken by one such company in one market may not only result in retaliation by others in that market but may result in retaliation in various ways in other markets, where the aggressor firm may be much more vulnerable. Thus, a structure of few very large firms with a network of interests in a host of industries becomes an economy where significant price competition would be minimal.

Mergers involving very large firms tend to trigger other mergers of this type. This of course means the encouragement of similar adverse economic consequences.

As a firm becomes larger, it becomes increasingly difficult to control constituent elements. Consequently, despite official corporate policies against reciprocal dealing and other anti-competitive practices, such practices can exist within firms and can be expected to increase as firms grow larger.

Northwest's experts, on the other hand, point out that depending on the particular industry, creation of a new large unit by acquisition or merger may have a pro-competitive effect. With respect to the general question of the overall effect of mergers of conglomerates into even more comprehensive corporate complexes, they agree with President Nixon's Task Force on Productivity and Competition headed by Professor George Stigler that too little study has been made of the economic consequences of conglomerates to justify an opinion as to their value or danger to the economy.

## ULTIMATE FINDINGS OF FACT

From the foregoing comprehensive and sometimes repetitious analysis of the evidence presented, the Court draws the following conclusions.

1. There are a large number of product and service lines in which the acquisition of Goodrich by Northwest may result in a reduction in competition in some area of the country. These include caustic soda, muriatic acid, HCPD (hexachlorocyclopentadiene), PVC (polyvinyl chloride), other chemicals, plastic pipe, co-product resin stream, footwear, shoe components, railroad supplies, cotton

yarn, and freight transportation, both truck and rail.

2. With respect to many of these product lines there is more than one possible potential anti-competitive aspect. Some involve both horizontal and vertical possibilities. Others involve both present as well as prospective competition or the elimination thereof.

3. On the basis of the present record, it is impossible to find that the Government would probably prevail at the ultimate trial with respect to any particular product or service line though the possibility of its so doing is clear. Moreover, the large number of product and service lines involved and the combinations and permutations inherent therein increases the possibility that the Government will ultimately prevail with respect to one or more of such lines.

4. The potential for the practice of reciprocity would be greatly increased since the combined Northwest-Goodrich would have substantial additional purchasing power and more diversified products and services to sell to its suppliers.

5. While it is clear that the potential for reciprocity would be substantially increased, the extent to which actual reciprocity would be practiced and, therefore, the probable actual anti-competitive effect thereof is, on the basis of the present record, difficult if not impossible to forecast.

6. Northwest is engaged in an aggressive policy of vertically and horizontally complementary acquisitions.

7. There is a trend towards the concentration of the production and distribution of goods and services in the hands of fewer and bigger corporations.

## ANALYSIS AND CONCLUSION

The sole question before the Court is whether or not to grant the Government's motion for a preliminary injunction against Northwest declaring its tender offer to Goodrich shareholders effective, pending a full hearing on the merits. The criterion to be applied is whether or not the Government has demonstrated a reasonable probability that it will be able to succeed at the hearing on the merits. The objective of enjoining is to preserve the status quo as effectively as possible pending a more comprehensive and deliberate examination of the proposed transaction.

In this latter connection, preserving the status quo pending a final hearing, Northwest vigorously urges that granting a preliminary injunction will not in fact accomplish that purpose but will, as a practical matter, have the same effect as a final injunction since it would be impossible to keep the tender offer viable for the period of time it would take to reach a final decision. It urges, therefore, that in lieu of a preliminary injunction, an order requiring Northwest to hold all Goodrich stock which it acquires in divestable form would better serve the status quo objective.

The Government and Goodrich, on the other hand, contend that if a showing of reasonable probability of success at the ultimate trial has been made a preliminary injunction is the appropriate relief regardless of its status quo implications.

An analysis of prior preliminary injunction proceedings under Section 7 of the Clayton Act reveals that of some twenty-two cases, preliminary injunctions were granted in nine and denied in thirteen. In passing, it may be noted that of the thirteen acquisitions as to which a preliminary injunction was denied, only one was subsequently held lawful and three are still pending. Even where no preliminary injunction has been granted, the ultimate success of the Government has turned out to be substantial.

Similarly, the trend of United States Supreme Court decisions since 1957 has been to interpret Section 7 broadly with the result that a number of acquisitions have been prohibited although the lower courts had found them not to be in violation of the section. In none of these cases were the potential anti-competitive aspects so diverse or so numerous as here. On the other hand, the record in

each was more precise and complete as to the actual or probable effects of the acquisition on a particular line of commerce in a particular area.

The Government urges that it has demonstrated a reasonable probability of success by its evidence of possible anti-competitive effect in various commodity and service lines in certain geographic areas or in the country as a whole. In addition, it asserts that the increased potential for reciprocity and reciprocity effect warrant a finding of probable success if not a presumptive conclusion of violation of Section 7. Finally, it contends that the consolidation of very large firms such as Northwest and Goodrich at a time of accelerated economic concentration violates Section 7.

As already discussed, while the record contains varying degrees of evidence as to the comparatively large number of lines of commerce in which the contemplated acquisition might have a substantial anti-competitive effect, it does not permit a definitive finding at the present time that such an effect will result with respect to any particular products or services. Given the number of alternative possibilities and the combinations and permutations existing with respect to some of them, it must be recognized that there is a very real possibility, if not a probability, that the Government in a trial on the merits will, with respect to one or more products or services, establish the requisite anti-competitive effect to constitute a violation of Section 7.

So far as the question of reciprocity and reciprocity effect is concerned, the same holds true.

■ The issue of concentration raises a special question, for the Government is here urging that given a trend to economic concentration, the consolidation of two of the country's one hundred largest corporations constitutes a violation of Section 7 without any specific demonstration of a substantial lessening of competition in any section of the country. We do not so read Section 7.

While it is certainly more probable that the consolidation of two of the country's corporate giants may have anti-competitive results in one or more lines of commerce, the Government contends that they are inherent in such mergers because of the great economic power resulting therefrom even though there is no competitive relationship between them. Presumably if United States Steel and A. & P. were to consider consolidating, this would be challenged as a violation of Section 7.

There may be very good reasons indeed to limit the growth of this country's largest corporations, particularly through mergers and acquisitions. The desirability of preserving the maximum number of competing units in any given line of commerce so long as they can compete effectively, the desirability of keeping entry barriers as low as possible, the increased potential for anti-competitive practices which may result from bigness, all are factors which may warrant a prohibition based on size alone. The law as it now stands, however, makes the adverse effect on competition the test of validity and until Congress broadens the criteria, the Court must judge proposed transactions on that standard.

Northwest, on the other hand, has presented evidence that the long-term economic viability of American railroads requires not only improvement in the efficiency of railroad operations by eliminating duplicating or parallel facilities and other wasteful practices, but also diversification through ownership of non-transportation profit-producing businesses. Again this raises questions of policy not reflected in existing law to which the Congress might well direct its attention but which are not relevant to our decision here.

■ We come then to that decision. Since we have been unable to find that the Government has demonstrated probable success with respect to any particular line of goods or services in any area of the country or with respect to the

anti-competitive effect of the increased potential for reciprocity inherent in a combined Northwest-Goodrich, since the statute requires examination of the effect on particular lines of commerce, and the whole, therefore, cannot be greater than the sum of its parts, and, perhaps most important, since the issuance of a preliminary injunction at this time would, rather than preserve the status quo, foreclose more careful and comprehensive consideration of the possible anti-competitive effects of the proposed acquisition, the Government's motion for a preliminary injunction against Northwest's declaring the tender offer effective will be denied.

At the same time, however, we must reemphasize the substantial number of areas of possible ultimate demonstration of Section 7 violations inherent in the acquisition as heretofore discussed. For this reason, and since it is our ultimate obligation to preserve the status quo to the maximum extent possible pending a full hearing, a comprehensive hold separate and status quo order will be entered requiring Northwest (1) to take all steps necessary to maintain Goodrich as a separate, viable, going concern; (2) take no action which might impair its ability to comply with any future order of divestiture; (3) preserve and protect all assets of Goodrich; (4) take no action which will substantially diminish the operations of Goodrich or dispose of any assets of Goodrich, except in the ordinary course of business, without further order of this Court; (5) refrain from using the name Goodrich or identifying the relationship between Goodrich and Northwest in any advertising, sales or promotional activities pertaining to the business of either corporation; (6) refrain from engaging in any reciprocity practices in either Goodrich or Northwest and take appropriate steps to insure compliance with this prohibition; (7) refrain from issuing any additional securities of Goodrich or incurring any additional indebtedness of Goodrich other than in the ordinary course of business without further order of this Court; (8) retain unencumbered all shares of Goodrich which it may own subject to further order of this Court, and (9) take such other action or refrain from such other action as the Court, after hearing, may deem necessary to achieve maximum preservation of the status quo consistent with the effective day-to-day operation of Goodrich. An order consistent with all the foregoing will enter.

## ORDER

Plaintiff, United States of America, filed its complaint herein on May 21, 1969, against defendants Northwest Industries, Inc. ("NWI") and The B. F Goodrich Company ("BFG"). On the same day, plaintiff moved for a temporary restraining order and a preliminary injunction. On May 22, 1969, this Court entered an Order temporarily restraining defendant from making effective its exchange offer to BFG stockholders pending determination of the plaintiff's motion for a preliminary injunction, which restraining order through extensions is still in effect. The hearing on the preliminary injunction began on May 22, 1969 and continued through June 14, 1969, and this Court rendered its opinion which constituted its Findings of Fact and Conclusions of Law on July 11, 1969.

It is hereby ordered, adjudged and decreed, pending the final determination of this action, that

### I

This Court has jurisdiction over the subject matter hereof and of all the parties thereto.

### II

The provisions of this Order applicable to any defendant shall apply to each such defendant and each of its officers, directors, employees and agents and to each of its subsidiaries, successors and assigns, and to all other persons in active concert or participation with any such defendant who shall have received

actual notice of this Order by personal service or otherwise.

## III

1. Effective this day and continuing until the day defendant NWI shall obtain ownership of or control over 25% of the outstanding common stock of BFG, defendant BFG shall be enjoined and restrained from, directly or indirectly,

   (a) Making available or communicating to NWI any customer list, trade secrets, formulas, knowhow or manufacturing processes of any BFG division or any information related thereto;

   (b) Engaging in reciprocity practices, or determining its purchasing on the basis of purchases of NWI products made by the various would-be suppliers, and taking appropriate steps to insure compliance with this provision;

   (c) Electing or retaining a director, or employing an officer or employee who is, at the same time, a director, officer or employee of defendant NWI;

   (d) Making any loans to defendant NWI or allowing BFG assets to be used as security for NWI indebtedness.

2. Defendant BFG shall be ordered and directed to

   (a) Exercise judgment independent of defendant NWI and without consultation with NWI on all matters not normally subject to review or judgment of the BFG Board of Directors;

   (b) Retain any and all assets, whether presently owned or acquired in the future for use of BFG, in the name of BFG, and to refrain from commingling such assets with those of NWI without further order of the Court.

## IV

Effective this day and continuing until the day defendant NWI shall obtain ownership of or control over 25% of the outstanding common stock of BFG,

1. Defendant NWI is enjoined and restrained from, directly or indirectly,

   (a) Taking any action which might impair its ability to comply with any future order of divestiture, including the encumbering of any BFG stock acquired pursuant to the tender offer, without prior court approval;

   (b) Using the BFG name or any of its trademarks or identifying the relationship between BFG and NWI in any advertising, sales or promotional activities pertaining to the business of either corporation;

   (c) Engaging in reciprocity practices, or determining its purchasing on the basis of purchases of BFG products made by the various would-be suppliers, and taking appropriate steps to insure compliance with this provision.

2. The Court reserves jurisdiction after hearing to enter such further orders and directions as it may deem necessary to achieve maximum preservation of the status quo consistent with the effective day-to-day operation of Goodrich.

## · V

Effective the day defendant NWI shall obtain ownership of or control over 25% or more of the outstanding common stock of BFG, and continuing thereafter,

1. Defendant NWI is ordered and directed to take all steps necessary to maintain BFG as a separate viable going concern. Pursuant thereto, defendant NWI is enjoined and restrained from, directly or indirectly,

   (a) Electing to the BFG Board of Directors any person who is at the same time or who has previously been or subsequently is named, a member of the Board of Directors of NWI, or any person who is a director, officer or employee of a corporation with

which a member of the NWI Board is affiliated, or appointing as a principal officer or employee of BFG a person who is, or subsequently becomes, an officer or employee of NWI;

(b) Transferring any employee of NWI to BFG or any BFG employee to NWI;

(c) Attempting to influence or interfere with BFG's independent judgment on any matter so as adversely to affect the competitive position of BFG vis-a-vis NWI.

2. Defendant NWI is enjoined and restrained from, directly or indirectly, taking any action which might impair its ability to comply with any future order of divestiture, including the encumbering of any BFG stock without prior Court approval.

3. Defendant NWI is ordered and directed to preserve and protect all assets of BFG. Pursuant thereto, NWI is enjoined and restrained from, directly or indirectly,

(a) Causing BFG to issue additional securities or to incur additional indebtedness (other than that incurred in the ordinary course of business) without further order of this Court;

(b) Causing BFG to loan money to, sell any capital assets to, or pledge any assets as collateral for indebtedness of NWI;

(c) Using the BFG name or any of its trademarks or identifying the relationship between BFG and NWI in any advertising, sales or promotional activities pertaining to the business of either corporation;

(d) Commingling any BFG assets with those of NWI or from taking title to any assets presently owned by BFG or subsequently acquired by BFG;

(e) Obtaining or seeking to obtain from BFG any customer list, trade secrets, formulas, know-how or manufacturing processes of any BFG division or any portion thereof.

4. Defendant NWI is enjoined and restrained from directly or indirectly,

(a) Taking any action which will substantially diminish the operations of BFG or to dispose of any assets of BFG except in the ordinary course of business, without further order of this Court;

(b) Engaging in reciprocity practices, or determining its purchasing on the basis of purchases of BFG or NWI products made by the various would-be suppliers, and taking appropriate steps to insure compliance with this provision, including the following:

(1) Discussions, transfer of information or exchange of materials between BFG and NWI relating to NWI or BFG purchases from or sales to third persons;

(2) Discussions, transfer of information or communications between BFG and its present and prospective accounts relating to sales to or purchases from NWI; and

(3) Discussions, transfer of information or communications between NWI and its present or prospective accounts relating to sales to or purchases from BFG.

5. Defendant BFG shall be enjoined and restrained from directly or indirectly

(a) Making available or communicating to NWI any customer list, trade secrets, formulas, knowhow or manufacturing processes of any BFG division or any information related thereto.

(b) Engaging in reciprocity practices, or determining its purchasing on the basis of purchases of BFG or NWI products made by the various would-be suppliers, and taking appropriate steps to insure compliance with this provision, including the same steps set forth in paragraph 4(b) hereof.

(c) Electing or retaining a director, or employing an officer or employee who is, at the same time, a director, officer or employee of defendant NWI.

(d) Making any loans to defendant NWI or allowing BFG assets to be used as security for NWI indebtedness.

6. Defendant BFG shall be ordered and directed to

(a) Preserve and protect all assets of BFG;

(b) Retain any and all assets, whether presently owned or acquired in the future for use of BFG, in the name of BFG and to refrain from commingling such assets with those of NWI without further order of the Court.

## VI

Jurisdiction is retained for the purpose of enabling any of the parties to this Order to apply to this Court at any time for such further orders and directions as may be necessary or appropriate for the construction or carrying out of this Order, for the modification of any provisions thereof, and for the enforcement of compliance therewith and punishment of violations thereof.